Filed 12/4/23  In re V.C. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re V.C., a Person Coming Under the Juvenile Court Law. | B327756<br>(Los Angeles County Super. Ct. No. 20CCJP05888A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>M.C.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore.  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, M.C. (father) appeals the juvenile court's order terminating his parental rights to his nine-year-old son, V.C. (son).  Father argues the juvenile court erred when it refused to apply the beneficial parental relationship exception to termination of parental rights.  Father claims, rather than terminating his parental rights and ordering adoption as son's permanent plan, the court should have applied the exception and ordered a legal guardianship instead.  As discussed below, we find no error and affirm.

## BACKGROUND

### 1.    The Family

Son is the only child of both mother and father.  Mother and father are not married and are not in a relationship.  They each have an extensive history of substance abuse.  Father also has anger issues, and mother suffers from mental health issues.  Previously, father's parents (son's paternal grandparents) had a restraining order against father because, more than once, he tried to break into their home.  At the start of the underlying proceedings, father was on probation for trying to break into paternal grandparents' home.

Although prior to the start of these proceedings, son primarily lived with mother, mother was in the habit of dropping son off at paternal grandparents' home for one week to months at

a time.  Son never lived with father, who had played a very limited role in son's life.  Since June or July 2020, son had been staying with his paternal grandparents.  Mother, father, and father's sister believed it was best that son be placed in the care of paternal grandparents, who wanted to provide permanency for son.

## 2.    Petition

In October 2020, mother abandoned son (who was seven years old at the time) at a fast-food restaurant.  Concerned restaurant employees called the police.  Son was removed and detained from his parents and placed with his paternal grandparents, where he remained for the duration of these proceedings.

In November 2020, after an initial investigation, the Los Angeles County Department of Children and Family Services (Department) filed a Welfare and Institutions Code section 300 petition on behalf of son (petition).[1]  The petition alleged mother and father abused drugs, mother had mental and emotional problems, father failed to protect son, and mother endangered son by driving with him while under the influence of alcohol and by leaving him unattended at a fast-food restaurant.

In February 2021, the juvenile court sustained the petition in part.  The court sustained the allegations relating to mother's conduct and father's failure to protect son.  The court dismissed the count alleging father's drug abuse.  The court declared son a dependent of the court under subdivision (b) of section 300.  The court removed son from mother's and father's custody and care, ordered family reunification services for both parents, and

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

3

granted monitored visits for the parents.  The court ordered father, among other things, to enroll in a parenting class and individual counseling, attend alcoholics anonymous meetings, and submit to random drug testing.  If father tested positive for any drugs, he would have to enroll in a substance abuse program.

### 3. Reunification Period

#### a. Son

The Department consistently reported son was thriving in the care of his paternal grandparents, with whom he shared a strong bond.  Paternal grandparents met all of son's needs and provided him with "ongoing emotional support and stability."  While in paternal grandparents' care, son made great strides both emotionally and academically.  Son stated he "loves living with his grandparents and wants to live with them forever."  He wanted to be adopted by them.  In February 2021, son handwrote a letter to the court stating, "I like living here with my grandma and papa.  I want to live here.  I do not want to live somewhere else."  Son consistently stated "he only feels safe with his grandparents" and "he does not feel safe being alone with either parent."  He did not want overnight or unmonitored visits with his parents.  At times, son talked about being abandoned and it was reported he had "trust issues."  Father's temper worried son.

Similarly, during counseling sessions, son was reluctant to talk about his parents and indicated he did not want to reunify with them, but instead wanted to stay with paternal grandparents.  In late 2021, son's therapist wrote, "[Son] would like to inform the court and [the Department social worker] that he wants the custody arrangement to remain unchanged.  He has stated that he wants to live with his paternal grandparents.  Currently, he is comfortable and secure in his environment.  It is

4

evident by his adjustment with his school performance, his broad social network, no longer have exhibits [*sic*] slept disturbance, improved appetite, and open to address his feelings. He can articulate clearly who he wants to live with but [is] reticent to acknowledge feelings of hurt or sadness. . . . I would like to stress that ***this minor has been truly clear with wanting to continue to live with his paternal grandparents***." Again in April 2022, son's therapist reported son's "major worry is whether he will be taken away from his grandparents which he views as his safety net. . . . [Son] has consistently reported his feelings of not wanting to be alone with either parent or live with either parent, and [that] has not wavered or changed." Son's therapist said, son "has made it very clear that when he says he wants to live with his grandparents, he means it." Son's therapist noted father's temper worried son, who feared father "is not able to maintain his composure." She said son "does not feel safe with father because of his father's temperament." Son's therapist stated it would " 'not be beneficial to [son]'s mental health to be unsupervised with either parent, especially father' " and she felt strongly that son was " 'flourishing and thriving because he is staying with his grandparents,' " who have always been in his life "and they have been his safety net."

By May 2022, after working with son for 19 months, his therapist reiterated son did not want to reunify with his parents. He wanted to stay with his paternal grandparents, with whom he had spent much of his life. In fact, at that time, son's therapist advised against conjoint counseling, stating "to incorporate conjoint counseling with the parents will create a decomposition and regression within the child." One month later, son's therapist noted son "consistently regresses with his sleep and

exhibits anxious attachment before a court date." The therapist believed son would "develop secure attachments and meet his developmental growth within normal limits if he remains permanently with his paternal grandparents."

### b. Father

By May 2021, father had been attending parenting classes and alcoholics anonymous meetings and had attended an intake for individual counseling. Father had submitted to five random drug tests, all of which were negative. Father acknowledged learning important coping, communication, and parenting skills through his court-ordered programs. He intended to focus on son's "wellbeing, keeping [him] safe, and will be the best role model for [him]." A social worker involved with father's parenting program described father as " 'one of the better parents we have had in a long time. He rarely misses a class. His level of self-awareness is far beyond other fathers. He is very transparent and open about his case, family, [son], and siblings.' " Father continued to do well in his programs and to test negative (albeit with two missed tests) through August 2022.

Father wanted to reunify with son, but by early 2022, father admitted son would not like living in father's shared studio apartment with no kitchen. Although father planned to work 60 to 80 hours a week, he did not have a childcare plan for son. Father stated he would " 'figure it out.' " Paternal grandmother believed father had improved his parenting skills over time, but by March 2022, she did not believe father was ready to care for son fulltime or meet his emotional needs. In May 2022, father felt he was building a strong bond with son. Father loved visiting with son and was "really trying to do the right things." In September 2022, however, the Department reported father

6

wanted the case to end and planned "to eventually seek full custody of [son] when father feels he is able to care for the child independently (without the assistance of [paternal grandmother])."

In April and July 2022 reports for the court, the Department stated father was compliant with, doing well in, and "fully engaged with" his court-ordered programs and services. Nonetheless, the Department reported father had been unable "to ensure safety and trust with [son]" or "to alleviate the apprehension [son] has to be alone with father." The Department noted, "Father also acknowledges that [son] does not feel safe with father, but he has no plan to promote safety if [son] were returned to his care, nor had he articulated a plan of basic care if he were to reunify with [son]." The Department reported father had "demonstrated changes in his life such as sobriety, maturity, employment, and has a car of his own for the first time in 7 years." Father stated he did not like that son did not want to reunify with father, but father understood and did not blame son for his choice. If he failed to reunify with son, father supported a legal guardianship for son with paternal grandparents.

c.    **Visits**

Visits between son and father were consistent and generally went well. Visits were always monitored. As of May 2021, it was reported father called son every day and visited with him every week. Son began to call father "dad," whereas before son referred to father by his first name.

During a December 2021 visit, father and paternal grandmother argued over father's previous life choices. Father stated he would be getting physical custody of son and could pick son up from paternal grandparents' home whenever he wanted.

7

Paternal grandmother described father's temper as "explosive." The episode made son cry and caused him increased anxiety. Son told paternal grandmother he did not want to live with father. Father expressed remorse for the incident. He brought it up in his parenting class to seek guidance. Later, during an April 2022 visit, father again became upset with paternal grandmother and repeatedly cursed at her. Father wanted to speak with son privately, but paternal grandmother would not allow it and ended the visit. After that visit, son was afraid father would speak to him the same way.

Although son generally enjoyed visits with father, son did not want to live with or reunify with him. Son also stated he did not want overnight or unmonitored visits with father. A Department social worker described father's relationship with son as "more of a big brother little brother relationship instead of father and son." In January 2023, it was reported son "still thinks of father . . . more as a big brother as opposed to a father figure."

### 4. Termination of Parental Rights

By April 2022, the Department recommended terminating parents' reunification services. Son's therapist strongly supported termination of reunification in order for son to receive permanency. In September 2022, the juvenile court terminated parents' reunification services and set the matter for a permanency planning hearing.

The Department believed adoption by paternal grandparents was in son's best interest and recommended that as son's permanent plan. Paternal grandparents wanted to adopt son and son wanted to be adopted by them. After the juvenile court terminated reunification services for parents, son's

therapist reported son was "doing exceptionally well" and "presented as relaxed, open and happy in sessions." The therapist explained son "feels that he doesn't have to 'worry about his safety' as he knows that if he is adopted by [paternal grandparents] he will always feel loved and be safe."

On February 28, 2023, more than two years after the underlying proceedings began, the juvenile court held the permanency planning hearing. At the hearing, father testified regarding his relationship with son, how it began and developed over the course of the underlying dependency case. Father explained he spoke by phone with son every night for approximately 30 minutes and visited in person once a week for approximately three to four hours. Father testified he works on his bond with son by "show[ing] up. I make the phone calls consistent. I just show him that I'm not going anywhere." Father stated his visits, both telephonic and in-person, were monitored.

Counsel for father asked the court not to terminate parental rights, arguing the beneficial parental relationship exception applied. Counsel stated father "has been able to build a relationship from scratch, maintain a constant visitation schedule and relationship, and has learned to continue to make that relationship stronger." Counsel for father argued the court should maintain father's parental rights and order a legal guardianship for son with paternal grandparents. In contrast, both counsel for son and the Department argued no exception to the termination of parental rights existed and the court should terminate parental rights and order adoption as son's permanent plan. Counsel for the Department noted son has "always been consistent [with] what he wants." "He wants stability. He wants security. He wants to stay with his grandparents."

9

After hearing father's testimony and argument from counsel, the juvenile court held the beneficial parental relationship exception to the termination of parental rights did not apply.  In making its ruling, the juvenile court found, assuming father maintained regular visitation, "there was no bond."  Moreover, the court held, "even if there were a bond, it's clear from the child's statements alone, . . . that the relationship with his parents do [*sic*] not outweigh the benefit of this child having a new home."  The juvenile court terminated parental rights and ordered adoption by paternal grandparents as son's permanent plan.

Father appealed.

## DISCUSSION

### 1.    Applicable Law

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies.  (§ 366.26, subds. (b) & (c)(1).)  Here, it is undisputed son was likely to be adopted.  Thus, our focus is whether a statutory exception to adoption and the termination of parental rights applies.

The exception father raises is the beneficial parental relationship exception.  This exception is set forth in section 366.26, subdivision (c)(1)(B)(i), which provides:  "[T]he court shall terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

10

To establish this exception, the parent must prove the following three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)  "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]  By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)  " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Id.* at p. 633.)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at p. 631.)

## 2.  Standard of Review

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review.  On the one hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception].  The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the

11

relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion.  As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]  The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " '  [Citation.]  But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' "  (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in

12

the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### 3. No Error

Father argues the juvenile court erred when it determined the beneficial parental relationship exception did not apply. Father claims he satisfied all three elements of the beneficial parental relationship exception. We assume father satisfied both the first element (regular visitation and contact with son) and the second element (a bond or relationship with son, the continuation of which would benefit son). We conclude, however, the trial court did not abuse its discretion in determining father failed to establish the third element.

As noted above, the third element requires the juvenile court to "decide whether it would be harmful to the child to sever the [parental] relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Although the loss of a parental relationship, including the one in this case, may certainly cause detriment to the child, the question for the juvenile court is whether the countervailing positives the child gains in a permanent, stable home outweigh any such detriment. (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

13

Here, the record is clear adoption with paternal grandparents outweighed any detriment caused to son by losing his relationship with father. It is undisputed son loved living with paternal grandparents and wanted to be adopted by them. Son was thriving with his grandparents. It is also beyond dispute that, although son enjoyed visits with father, son consistently and clearly indicated he did not want to reunify with father or even spend time with him unless someone else was there to monitor the visit. Son repeatedly expressed concern over father's temper and worried he might be the object of it one day. Son feared being abandoned and had trust issues. Despite father's best and laudable efforts, son did not feel safe being alone with father. Son's longstanding therapist opined son craved and required security and stability. The therapist believed son's developmental growth would be on track if he stayed permanently with his paternal grandparents. On this record, the juvenile court did not abuse its discretion in concluding the benefits of adoption by paternal grandparents outweighed any detriment son might experience from the termination of his relationship with father.

We are not persuaded by father's arguments addressing the age and fitness of paternal grandparents or the fact that family members are the adoptive parents. These points are speculative and not supported by legal citation. Finally, because we affirm the juvenile court's decision, we do not address father's request for a bonding study on remand.

14

## DISPOSITION

The juvenile court's February 28, 2023 order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.

15